CNA COVERAGE LITIGATION GROUP
ROBERT C. CHRISTENSEN (SBN 151296)
Email:  robert.christensen@cna.com
555 12th Street, Suite 600
Oakland, CA  94607
Telephone:  510.645.2300
Facsimile:    510.645.2323


JULIE A. HUMPRHEYS (SBN 92985)
Email:  julie.humphreys@cna.com
675 Placentia Avenue, Suite 175
Brea, CA 92821
Telephone:  714.674.5693
Facsimile:    714.256.7663


WILEY REIN LLP
Richard A. Simpson  (admitted *pro hac vice*)
Joseph W. Gross (admitted *pro hac vice*)
Email:  rsimpson@wiley.law
Email:  jgross@wiley.law
1776 K Street NW
Washington, DC  20006
Telephone:  202.719.7000
Facsimile:  202.719.7049


*Attorneys for Defendant Continental Casualty Company*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDEX OFFICE AND PRINT SERVICES, INC., a Texas corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL CASUALTY COMPANY,<br>Defendant. | Case No. 2:20-CV-4799-MWF-AGR<br><br>**CONTINENTAL CASUALTY COMPANY'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>[Filed concurrently with Declaration of Kevin Walsh, and [Proposed] Order]<br><br>Date: October 19, 2020<br>Time: 10:00 a.m.<br>Court: 5A<br>Hon. Michael W. Fitzgerald |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 10:00 am on October 19, 2020, or as soon thereafter as this matter may be heard in Courtroom 5A of the above-referenced Court, located at 350 West First Street, Los Angeles, CA 90012, defendant CONTINENTAL CASUALTY COMPANY will present a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The motion for judgment on the pleadings is based upon the grounds that the Complaint fails to allege facts sufficient to state a claim upon which relief can be granted against Continental.

1

This motion will be and is based upon this Notice, the Memorandum of Points and Authorities, the Declaration of Kevin Walsh, the Complaint, the pleadings and papers on file herein, and any argument at the hearing of this matter.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 28, 2020.


Dated:  September 11, 2020                    Respectfully Submitted,


                                             CNA COVERAGE LITIGATION
                                             GROUP

                                             /s/ Robert Christensen_____
                                             Robert Christensen
                                             Julie Humphreys


                                             WILEY REIN LLP
                                             Richard A. Simpson (admitted *pro hac vice*)
                                             Joseph W. Gross (admitted *pro hac vice*)

                                             *Attorneys for Defendant Continental Casualty Company*

2

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ...................................................................................1

STATEMENT OF FACTS ........................................................................3

ARGUMENT ..........................................................................................9

I.    This case is suitable for resolution on the pleadings. .....................9

II.   The substantive law of Texas applies to this coverage action. ........9

III.  The Policy's clear language governs. ..........................................10

IV.   The Professional Services Insuring Agreement is not triggered. .................11

V.    The Media Liability Insuring Agreement is not triggered. ...........................16

VI.   Since no coverage is available under the Policy, FedEx's extra-contractual claim also fails. ............................................20

VII.  Even if coverage is available, FedEx's extra-contractual claim should be dismissed. ..................................................22

CONCLUSION .....................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

Ameron International Corp. v. American Home Assurance Co.,
   No. CV 11-1601 CAS AGRX, 2011 WL 2261195 (C.D. Cal. June
   6, 2011) ....................................................................................................10

Ashcroft v. Iqbal,
   556 U.S. 662 (2009).................................................................................9

Bennett v. U.S. Liability Insurance Group,
   No. 3:13-CV-01565-SI, 2014 WL 1660654 (D. Or. Apr. 25, 2014).................13

Burgert v. Lokelani Bernice Pauahi Bishop Trust,
   200 F.3d 661 (9th Cir. 2000) ..................................................................9

CAMCO Pacific Construction Co., Inc. v. Lexington Insurance Co.,
   No. SACV131807DOCJPRX, 2014 WL 12584440 (C.D. Cal. May
   21, 2014) ...................................................................................................23

Colony Insurance Co. v. Fladseth,
   No. C 12-1157 CW, 2013 WL 1365988 (N.D. Cal. Apr. 3, 2013) ....................13

Coto Settlement v. Eisenberg,
   593 F.3d 1031 (9th Cir. 2010) ................................................................6

Creative Hospitality Ventures, Inc. v. U.S. Liability Insurance Co.,
   444 F. App'x 370 (11th Cir. 2011) .....................................................17

Dworkin v. Hustler Magazine Inc.,
   867 F.2d 1188 (9th Cir. 1989) ................................................................9

Forbau v. Aetna Life Insurance Co.,
   876 S.W.2d 132 (Tex. 1994) ...........................................................10, 15

Frontier Oil Corp. v. RLI Insurance Co.,
   153 Cal. App. 4th 1436, 63 Cal. Rptr. 3d 816 (2007) ........................10

Garza v. Allstate Fire & Casualty Insurance Co.,
   No. 7:19-CV-129, 2020 WL 3077596 (S.D. Tex. June 10, 2020) ..............21, 22

ii

*Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London,*
 327 S.W.3d 118 (Tex. 2010) ...............................................................11

*Gregg & Valby, L.L.P. v. Great American Insurance Co.,*
 316 F. Supp. 2d 505 (S.D. Tex. 2004)...............................10, 11, 12, 14

*Guey Ming Yeh v. Safeco Insurance Co. of Indiana,*
 No. 4:18-CV-00026, 2018 WL 1858151 (E.D. Tex. Apr. 18, 2018) .................23

*Hampton Medical Goup, P.A. v. Princeton Insurance Co.,*
 366 N.J. Super. 165, 840 A.2d 915 (N.J. Super. Ct. App. Div.
 2004) ...............................................................................13

*Horizon West, Inc. v. St. Paul Fire & Marine Insurance Co.,*
 45 F. App'x 752 (9th Cir. 2002) ................................................12, 15

*Jerome Grp., Inc. v. Cincinnati Insurance Co.,*
 257 F. Supp. 2d 1217 (E.D. Mo. 2003) .........................................13, 15

*John M. O'Quinn, P.C. v. Lexington Insurance Co.,*
 906 F.3d 363 (5th Cir. 2018) ....................................................11

*John M. O'Quinn P.C. v. National Union Fire Insurance Co. of*
 *Pittsburgh, PA,*
 33 F. Supp. 3d 756 (S.D. Tex. 2014)........................................11, 12, 14

*Klaxon Co. v. Stentor Electric Manufacturing Co.,*
 313 U.S. 487 (1941).................................................................9

*MacKinnon v. Truck Insurance Exchange,*
 31 Cal. 4th 635, 73 P.3d 1205 (2003).........................................11, 15

*Marentes v. State Farm Mutual Automobile Insurance Co.,*
 224 F. Supp. 3d 891 (N.D. Cal. 2016).........................................21, 22

*Medical Records Associates, Inc. v. American Empire Surplus Lines*
 *Insurance Co.,*
 142 F.3d 512 (1st Cir. 1998).....................................................13

*Moore v. Allstate Texas Lloyd's,*
 742 F. App'x 815 (5th Cir. 2018)..............................................21, 22

iii

National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.,
   907 S.W.2d 517 (Tex. 1995) ............................................................10

Pias v. Continenal Casualty Insurance Co.,
   No. 2:13-CV-00182-PM-KK, 2013 WL 4012709 (W.D. La. Aug.
   6, 2013) ............................................................13

PMI Mortgage Insurance Co. v. American International Specialty
   Lines Insurance Co.,
   394 F.3d 761 (9th Cir. 2005) ............................................................14

Princeton Insurance Co. v. Kosoy,
   No. CIV. A. 98-4985, 1999 WL 79055 (E.D. Pa. Feb. 9, 1999) ......................13

Redlands Country Club Inc. v. Continenal Casualty Co.,
   No. CV101905GAFDTBX, 2011 WL 13224844 (C.D. Cal. Oct. 4,
   2011) ............................................................12

Reliance National Insurance Co. v. Sears, Roebuck & Co.,
   58 Mass. App. Ct. 645, 792 N.E.2d 145 (2003) ............................................13

Shamoun & Norman, LLP v. Ironshore Indemnity, Inc.,
   56 F. Supp. 3d 840 (N.D. Tex. 2014) ............................................................14

State Farm Life Insurance Co. v. Beaston,
   907 S.W.2d 430 (Tex. 1995) ............................................................10

Ticknor v. Rouse's Enterprises, LLC,
   2 F. Supp. 3d 882 (E.D. La. 2014) ............................................................17

Tomaselli v. Transamerica Insurance Co.,
   25 Cal. App. 4th 1269, 31 Cal. Rptr. 2d 433 (1994) ............................................23

Transportation Insurance Co. v. Moriel,
   879 S.W.2d 10 (Tex. 1994) ............................................................23

U.S. Fire Insurance Co. v. Williams,
   955 S.W.2d 267 (Tex. 1997) ............................................................22

USAA Texas Lloyds Co. v. Menchaca,
   545 S.W.3d 479 (Tex. 2018) ............................................................21, 22

iv

<u>Waller v. Truck Insurance Exchange, Inc.</u>,
  11 Cal. 4th 1, 900 P.2d 619 (1995)......................................................................22

<u>Walsh v. Provident Mutual Life Insurance Co. of Philadelphia</u>,
  No. CV98-10602 NM(RCX), 1999 WL 511928 (C.D. Cal. Apr. 22,
  1999) ...........................................................................................................................23

<u>Warren v. Fox Family Worldwide, Inc.</u>,
  328 F.3d 1136 (9th Cir. 2003) ......................................................................................9

<u>Weidner v. Nationwide Property & Casualty Insurance Co.</u>,
  No. 4:13-CV-263, 2014 WL 8397281 (E.D. Tex. June 6, 2014) .......................23

<u>Western Reserve Life Insurance Co. v. Meadows</u>,
  152 Tex. 559, 261 S.W.2d 554 (1953) ...........................................................11, 17

<u>Whole Enchilada, Inc. v. Travelers Property Casualty Co. of America</u>,
  581 F. Supp. 2d 677 (W.D. Pa. 2008)............................................................18

<u>Williams v. Chubb Group of Insurance Cos.</u>,
  77 F.3d 491 (9th Cir. 1996) ...........................................................................22

**Statutes and Rules**

15 U.S.C. § 1681c(g) ...........................................................................................5

Cal. Civ. Code § 1646.........................................................................................10

Fed. R. Civ. P. 12(c).............................................................................................9

v

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This is an insurance coverage case well-suited for resolution on a motion for judgment on the pleadings.  The facts as alleged do not trigger either of the relevant insuring agreements of the insurance policy at issue.  Consequently, there is no coverage and defendant Continental Casualty Company ("Continental") is entitled to a judgment dismissing the Complaint with prejudice.

The issue presented is simple.  The Fair and Accurate Credit Transaction Act ("FACTA") prohibits businesses from printing more than five digits of any customer's credit card number on a receipt in order to reduce the risk of identity theft.  FedEx Office and Print Services, Inc. ("FedEx") claims that a software vendor error caused its self-service kiosks to print receipts showing more than five digits of customers' credit cards.  As a result, FedEx faced three putative class-action lawsuits alleging violation of FACTA, which have now settled (the "FACTA Actions").

FedEx sought coverage for the FACTA Actions under an Enterprise Professional Solutions Policy issued by Continental, contending that those claims triggered coverage under the Policy's Professional Services Liability Insuring Agreement and its Media Liability Insuring Agreement. Continental denied coverage because neither insuring agreement applies.

The Professional Services Insuring Agreement is triggered by a **Professional Services Claim,** which, in turn, is defined as "any **Claim** arising out of a **Wrongful Act** in the performance of **Professional Services**."  Courts consistently hold that ministerial acts such as billing, which are common to all businesses, do

1

Case No. 2:20-CV-4799-MWF-AGR
Continental's Memorandum of Points and Authorities in
Support of its Motion for Judgment on the Pleadings

not constitute professional services.  The same logic applies *a fortiori* to a receipt, which is essentially an automatically generated confirmation of payment of a bill.

Here, **Professional Services** is defined to include numerous services provided to customers including "printing" and "services related thereto."  The enumerated items in the definition are the services FedEx renders to customers, such as printing, scanning, and copying customers' documents.  Printing a receipt, by contrast, is a record of the customer's payment of the fee charged for services already performed.  Interpreting the definition of **Professional Services** to include printing a receipt is contrary to the great weight of authority and ignores the context provided by the other services listed.  Additionally, interpreting "services related thereto" to encompass printing receipts would defeat the purpose of enumerating specific professional services, because, under such a broad reading, virtually all of FedEx's business activities would be included in the definition of **Professional Services**.

The Media Liability Insuring Agreement is triggered by a **Media Claim**, which is defined as "a **Claim** arising out of **Media Activity** and alleging [certain enumerated types of conduct]."  **Media Activity** is defined in relevant part as "any actual or alleged act, error or omission occurring in the course of... the dissemination or utterance of **Material**, by any means, including… printing…."  Policy § II.  The definition of **Media Claim** expressly excludes any **Claim** alleging **Privacy Injury**.

FedEx's contention that the FACTA Actions qualify as a **Media Claim** fails at the outset because those claims do not arise out of **Media Activity**; no reasonable person could think that printing a receipt constitutes dissemination of **Material**.  Moreover, the FACTA Actions do not allege any of the prerequisite

conduct required for a **Media Claim**, and, even if they did, they would be expressly excluded from the definition of **Media Claim** because they allege **Privacy Injury**.

Since neither of the relevant insuring agreements is triggered, Continental did not breach its contract with FedEx.  Absent a breach of the policy, an extra-contractual claim such as breach of the covenant of good faith and fair dealing cannot lie where, as here, there are no allegations of damages independent of the denial of benefits under the policy.  And even if coverage for the FACTA Actions was available under the Policy, the extra-contractual claim should still be dismissed because the Complaint alleges nothing more than a bona fide dispute over insurance coverage.  Judgment on the pleadings is therefore warranted on both the breach-of-contract and extra-contractual claim.

## STATEMENT OF FACTS[1]

**The Policy:**

Continental issued Enterprise Professional Solutions Policy number 592397004 with a policy period of May 15, 2017 to May 15, 2018 (the "Policy") to FedEx.  Ex. A.[2]  The Policy contains a Limit of Liability of $10 million per **Claim** and $10 million in the aggregate, with a $250,000 Retention.  Policy, Enterprise Professional Solutions Declarations.  The Policy provides that "[t]he **Insureds**, and not the Insurer have the duty to defend **Claims**."  Id. Endorsement No. 11, at III.B.  The Policy includes two Insuring Agreements that are relevant here:  Professional Services Liability; and Media Liability.  See id. § I.A.

---

[1] For the purposes of this motion, Continental—as it must—treats the facts alleged in the Complaint as true.  Continental reserves its right to contest the truth of the allegations in the Complaint if this litigation proceeds.

[2] References to "Ex. _" are references to exhibits to the Declaration of Kevin Walsh.

Under the Professional Services Liability Insuring Agreement, Continental agreed to pay "**Damages** and **Claim Expenses** resulting from any **Professional Services Claim** both first made against the **Insured** and reported to the Insurer in writing during the **Policy Period** … alleging any **Wrongful Act** by the **Insured**, or by someone for whose **Wrongful Act** the Insured is legally responsible." Id. § I.A.2.

The Policy defines a **Professional Services Claim** as "any **Claim** arising out of a **Wrongful Act** in the performance of **Professional Services**." Id. § II.

A **Wrongful Act** under the Professional Services Liability Insuring Agreement is defined as "any actual or alleged act, error, omission, neglect or breach of duty … committed solely in the conduct of **Professional Services[**.]" Id. § II.

"**Professional Services** means providing document scanning, storage and retrieval, video conferencing, account management, finishing and faxing services, custom printing and copying services, outsourcing, notary services and rental of access to personal computer with business software applications and internet access, document creation, digital printing, direct mail, signs and graphics and services related thereto." Id. Endorsement No. 11 § I.B.

Under the Media Liability Insuring Agreement, Continental agreed to pay "**Damages** and **Claim Expenses** resulting from liability imposed by law or Assumed under Contract resulting from any **Media Claim** both first made against the **Insured** and reported to the Insurer in writing during the **Policy Period** … alleging any **Wrongful Act** by the **Insured**, or by someone for whose **Wrongful Act** the **Insured** is legally responsible[.]" Id. § I.A.3.

A **Media Claim** is defined as "a **Claim** arising out of **Media Activity** and alleging [one of nine categories of predicate claims]" Id. § II.  However, **Media Claim** does not include any **Claim** alleging **Privacy Injury**.  Id.

**Media Activity** is defined as "any actual or alleged act, error or omission occurring in the course of … the dissemination or utterance of **Material**, by any means, including… publishing, producing, printing, advertising, marketing, promoting and exhibiting… through any medium, including but not limited to wireless or electronic medium." Id.

**Material** is defined as "media content, in any format, and all software used to distribute or display such media content…." Id.

A **Privacy Injury** is defined as "any unauthorized disclosure of… **Nonpublic Personal Information** … in violation of: …any federal, state, foreign or other law (including common law), statute or regulation governing the confidentiality, integrity or accessibility of information…" Id.

**Nonpublic Personal Information** is defined as "two or more elements of information not available to the general public from which an individual may be identified, including without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, and account histories." Id.

**The FACTA Actions:**

FACTA prohibits businesses from printing more than five digits of a customer's card number on any receipt provided to the cardholder at the point of sale or transaction.  15 U.S.C. § 1681c(g).  FedEx "is a retail chain of more than 2,000 locations that provide retail outlets for FedEx air and ground shipping, as

5

well as printing, copying and binding services."  Compl. ¶ 8.  FedEx provides self-service kiosks at its stores.  As FedEx explained:

> The kiosks allow customers to insert a credit or debit card at the beginning of obtaining service. The customer can then print from email, from the internet, from USB media, and can also copy or scan hard copy documents. Upon completion of the services, the kiosk prints a receipt that includes a record of the price charged, as well as advertising information. The customer then takes the receipt along with any printed documents.

Id. ¶ 2.  FedEx alleges that a vendor charged with maintaining the point-of-sale software for the kiosks "erroneously installed a software update" that printed receipts with more than five digits of customers' credit card numbers.  Id. ¶¶ 2-3. As a result, FedEx was named in three putative class-action lawsuits alleging violations of FACTA's credit card truncation requirement—two in California and one in Illinois (together, the "FACTA Actions").  Id. ¶ 2.[3]

*The Cohen Lawsuit*

On August 8, 2017, Robert Cohen filed a Class Action Complaint before the California Superior Court in Alameda County styled <u>Robert Cohen, individually and on behalf of all others similarly situated v. FedEx Office and Print Services, Inc., and DOES 1 through 50, inclusive</u>, Case No. CIVDS1818604 (the "Cohen Lawsuit").  Ex. B.  The Cohen Lawsuit asserted that FedEx willfully, knowingly, and intentionally violated FACTA and failed to protect plaintiff and others against

---

[3] On a motion for judgment on the pleadings, courts may consider "documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." <u>Coto Settlement v. Eisenberg</u>, 593 F.3d 1031, 1038 (9th Cir. 2010) (collecting cases). Because the Complaint clearly references the complaints in the FACTA Actions and they are integral to the current coverage dispute, the Court can consider those documents in deciding this motion.

Case No. 2:20-CV-4799-MWF-AGR
Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings

identity theft "by printing more than the last 5 digits of the credit and/or debit card on receipt provided to cardholders transacting business with [FedEx] for their services." Cohen Lawsuit ¶¶ 13, 70.

*The Beltran Draft Complaint*

On August 16, 2017, counsel for Ashley Beltran forwarded a letter of intent and Draft Class Action Complaint to FedEx, similarly alleging violations of FACTA as a result of FedEx's failure to truncate customers' credit card information on receipts (the "Beltran Draft Complaint"). Ex. C. The Beltran Draft Complaint alleged that FedEx "continues to deliberately, willfully, intentionally, recklessly, and negligently violate FACTA by issuing receipts that reveal too many digits of consumers' debit and credit card account numbers." Beltran Draft Compl. ¶ 16. The Draft Complaint alleged that violating the truncation requirement, "not only violates the law, it exacts harm by exposing consumers' sensitive account information and subjecting each affected consumer to an ongoing elevated risk of becoming the victim of identity theft." Id. ¶ 17.[4]

*The Duncan Lawsuit*

On October 31, 2017, Karen Duncan filed a Class Action Complaint before the Illinois Circuit Court styled Karen Duncan, individually and on behalf of all others similarly situated v. FedEx Office and Print Services, Inc., a Texas Corporation, Case No. 2017 CH 14517 (the "Duncan Lawsuit"). Ex D. The Duncan Lawsuit alleged that "[b]ecause FedEx willfully fails to comply with FACTA's clear truncation mandate, thousands of FedEx customers have been burdened with a heightened risk of payment card fraud and identify theft." Id. ¶ 6.

---

[4] Ms. Beltran was later added a plaintiff in the Cohen Lawsuit. See First Amended Complaint, Cohen v. FedEx Office & Print Servs., Inc., Case No. CIVDS1818604 (Cal. Super. Ct., San Bernardino Cty. July 30, 2018).

Case No. 2:20-CV-4799-MWF-AGR
Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings

The Duncan Lawsuit claims "FACTA's truncation requirements were meant to reduce consumer risks of payment card fraud and identity theft, but FedEx's practices do the opposite by exposing card account digits and by empowering criminals to commit effective social-engineering attacks." Id. ¶ 29.  The Duncan Lawsuit alleged that from the information revealed on FedEx's receipts, fraudsters could glean additional information regarding customers' bank, card brand, and transaction history, which could be used for identity theft. Id. ¶¶ 30-35.

All of the FACTA Actions have now settled.  Compl. ¶ 5.

**The Coverage Dispute:**

FedEx sought coverage for the FACTA Actions under the Policy.  Compl. ¶ 17.  In a letter dated October 24, 2017, Continental denied coverage because neither the Media Liability nor the Professional Services Liability Insuring Agreements is triggered.  Id. ¶¶ 17, 19-20.  FedEx requested that Continental reconsider its position.   After considering FedEx's arguments, Continental maintained its denial and expounded upon its coverage position in a February 20, 2018 letter. Id. ¶¶ 4, 18, 22.[5]

In this lawsuit, FedEx alleges that Continental breached the Policy by failing to provide coverage for the FACTA Actions. Id. at Count I.  FedEx further alleges that Continental breached the covenant of good faith and fair dealing by wrongfully denying the claim without adequate substantiation or investigation. Id. at Count II.

---

[5] Continental also denied coverage based on prior knowledge and relation back to **Claims** made before its **Policy Period**.  Although Continental contends that there is no coverage available for these additional reasons, it only addresses the insuring agreements here.

## ARGUMENT

**I.    This case is suitable for resolution on the pleadings.**

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A motion under Rule 12(c) is "functionally identical" to a motion under Rule 12(b)(6) and the same standard of review applies.  Dworkin v. Hustler Mag. Inc., 867 F.2d 1188, 1192 (9th Cir. 1989).  To survive a motion to motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Although "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party, Burgert v. Lokelani Bernice Pauahi Bishop Tr., 200 F.3d 661, 663 (9th Cir. 2000), courts do "not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003).

**II.    The substantive law of Texas applies to this coverage action.**

A federal court sitting in diversity applies the choice-of-law rules of the forum State—here, California.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Under California law, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  Cal. Civ. Code § 1646; see Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th 1436, 1460, 63 Cal. Rptr. 3d 816, 836 (2007) (applying Section 1646

9

to insurance policy interpretation).  Where an insurance policy does not indicate a particular place of performance, the court applies the law of the state in which the policies were made.  Ameron Int'l Corp. v. Am. Home Assurance Co., No. CV 11-1601 CAS AGRX, 2011 WL 2261195, at *5 (C.D. Cal. June 6, 2011).  "A contract is made in the state in which 'the last act necessary to the contract, the acceptance, was performed.'"  Id.  (quoting Ury v. Jewelers Acceptance Corp., 227 Cal. App. 2d 11, 16, 38 Cal. Rptr. 376, 380 (Ct. App. 1964)).

Here, the Policy does not specify a place of performance and there are no state amendatory endorsements.  Accordingly, Texas law should apply, as that is where the contract was accepted.  Nonetheless, because Continental understands that FedEx contends that California law applies, Continental addresses California law as well; the result is the same regardless of which law applies.

## III.   The Policy's clear language governs.

Under Texas law, courts can interpret insurance policies as a matter of law. Gregg & Valby, L.L.P. v. Great Am. Ins. Co., 316 F. Supp. 2d 505, 508 (S.D. Tex. 2004).  "[T]he interpretation of insurance contracts is governed by the same rules of construction applicable to other contracts."  State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995).  "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument."  Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).  "The contract must be considered as a whole" and "each part of the contract should be given effect."  Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994).  In interpreting insurance policies, terms "are to be given their plain, ordinary and generally accepted meaning."  Western Reserve Life Ins. Co. v. Meadows, 152 Tex. 559, 564, 261 S.W.2d 554, 557 (1953). "When a contract as worded can be given 'a definite or certain legal meaning,'

then it is unambiguous as a matter of law and the court enforces it as written." Gregg & Valby, L.L.P., 316 F. Supp. 2d at 509 (quoting CBI Indus., Inc., 907 S.W.2d at 520). "Only if an insurance contract is susceptible to multiple reasonable interpretations must a court adopt the interpretation most favorable to the insured." John M. O'Quinn P.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 33 F. Supp. 3d 756, 764 (S.D. Tex. 2014) (citing Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d at 520), aff'd sub nom. John M. O'Quinn, P.C. v. Lexington Ins. Co., 906 F.3d 363 (5th Cir. 2018). However, "a court will not find a contract ambiguous merely because the parties offer contradictory interpretations." Id. (citing Cent. States, Se. & Sw. Areas Pension Fund v. Creative Dev. Co., 232 F.3d 406, 414 n. 28 (5th Cir.2000)). "The insured has the burden of establishing coverage under the terms of the policy." Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London, 327 S.W.3d 118, 124 (Tex. 2010) (citing Ullico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 782 (Tex. 2008)).

California law regarding policy interpretation is substantively the same. See MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 647–48, 73 P.3d 1205, 1212–13 (2003) (setting forth California rules of insurance policy interpretation).

## IV.     The Professional Services Insuring Agreement is not triggered.

The Professional Services Insuring Agreement is not triggered because printing a receipt is not providing a **Professional Service**. In order for the Professional Services Liability Insuring Agreement to be triggered, there must be a **Professional Services Claim** made during the **Policy Period**. Policy § I.A.2. A **Professional Services Claim** must arise "out of a **Wrongful Act** *in the performance of Professional Services*." Id. § II (emphasis added). FedEx's **Professional Services** are defined to mean "providing document scanning, storage

and retrieval, video conferencing, account management, finishing and faxing services, custom printing and copying services, outsourcing, notary services and rental of access to personal computer with business software applications and internet access, document creation, digital printing, direct mail, signs and graphics and services related thereto." Id. Endorsement No. 11 § I.B.

Under Texas law, billing and fee-setting practices are generally not considered to be professional services within the meaning of an insurance policy. Gregg & Valby, L.L.P., 316 F. Supp. 2d at 513; John M. O'Quinn P.C., 33 F. Supp. 3d at 772. "Simply put, [billing and fee setting are] administrative tasks inherent to all businesses." Gregg & Valby, L.L.P., 316 F.Supp.2d at 513 (citing Visiting Nurse Ass'n of Greater Phila. v. St. Paul Fire & Marine Ins. Co., 65 F.3d 1097, 1101 (3d Cir. 1995)). Put otherwise, "'the bill is an effect of the service provided not part of the service itself.'" Horizon West, Inc. v. St. Paul Fire & Marine Ins. Co., 45 F. App'x 752, 754 (9th Cir. 2002) (quoting Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co., 142 F.3d 512, 516 (1st Cir. 1998)).

Courts applying California law reach the same conclusion. See, e.g., id. (granting insurer's motion to dismissing; finding billing not to be a professional service); Redlands Country Club Inc. v. Cont'l Cas. Co., No. CV101905GAFDTBX, 2011 WL 13224844, at *6 (C.D. Cal. Oct. 4, 2011) (granting insurer's motion for judgment on the pleadings; "mere billing services do not qualify as 'professional services'"); Colony Ins. Co. v. Fladseth, No. C 12-1157 CW, 2013 WL 1365988, at *9 (N.D. Cal. Apr. 3, 2013) (similar). Indeed, courts across the country agree on this common-sense proposition that billing for services performed is not itself a professional service. See, e.g., Bennett v. U.S.

Liab. Ins. Grp., No. 3:13-CV-01565-SI, 2014 WL 1660654, at *6 (D. Or. Apr. 25, 2014); Pias v. Cont'l Cas. Ins. Co., No. 2:13-CV-00182-PM-KK, 2013 WL 4012709, at *5 (W.D. La. Aug. 6, 2013); Princeton Ins. Co. v. Kosoy, No. CIV. A. 98-4985, 1999 WL 79055, at *3 (E.D. Pa. Feb. 9, 1999); Reliance Nat'l Ins. Co. v. Sears, Roebuck & Co., 58 Mass. App. Ct. 645, 648, 792 N.E.2d 145, 148 (2003); Hampton Med. Grp., P.A. v. Princeton Ins. Co., 366 N.J. Super. 165, 180, 840 A.2d 915, 925 (N.J. Super. Ct. App. Div. 2004); see generally Appleman on Insurance § 146.3 ("Billing and other administrative activities are generally not considered to be professional service").

Although many of the cited cases involve lawyers and doctors, the relevant principles are the same regarding provision of other services.  In fact, courts have held billing not to be a professional service in the specific context here, *i.e.,* where the insured's business involves printing and copying.  See, e.g., Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co., 142 F.3d at 516 ("We fail to see how setting a price for photocopies and producing accurate invoices are other than generic business practices"); Jerome Grp., Inc. v. Cincinnati Ins. Co., 257 F. Supp. 2d 1217, 1225 (E.D. Mo. 2003) ("This billing is an effect of PSG's services and is not the printing services themselves.").  Here, a printed receipt is generated automatically, thus making it even more ministerial than an invoice that was compiled and reviewed using professional discretion.

The cases FedEx has cited in correspondence with Continental do not counsel otherwise.  Shamoun & Norman, LLP v. Ironshore Indemnity, Inc., 56 F. Supp. 3d 840 (N.D. Tex. 2014) is easily distinguishable.  There, the court recognized that, as a general matter, billing is not a professional service.  However, the policy in question covered all claims "arising out of" professional services.

13

Reading the phrase "arising out of" broadly, the court held that the insurer had a duty to defend the underlying claim.  Id.  Here, the Policy and controlling language are very different.  First, the Policy is not a duty-to-defend policy.  Second, the Policy does not use the broad term "arising out of" but instead limits coverage to **Claims** alleging **Wrongful Acts** "in the performance of" **Professional Services**.

Likewise, to the extent California law applies, PMI Mortgage Insurance Co. v. American International Specialty Lines Insurance Co., 394 F.3d 761, 766 (9th Cir. 2005) does not support FedEx's position.  There, the court recognized that "California state courts have uniformly held that insurance policies covering "professional services" reach only those acts committed by the insured in his or her capacity as a professional—they do not cover general administrative activities that occur in all types of businesses."  Id.  The Ninth Circuit reversed the district court because the specific claims at issue—an alleged kickback scheme—went beyond merely sending inflated invoices and related to the insured's core business.  Id. The Ninth Circuit did not question the well-established rule that administrative and billing activities are not "professional services."  Id. at 766-67.

The FACTA Actions arose out of receipts printed at FedEx kiosks.  Printing a receipt is an administrative function akin to billing, which is not a professional service.  See Gregg & Valby, L.L.P., 316 F. Supp. 2d at 513; John M. O'Quinn P.C., 33 F. Supp. 3d at 772.  The receipt is merely a record of payment for the services already performed, not the service itself.  Horizon West, Inc., 45 F. App'x at 754.  Printing a receipt does not morph into a professional service simply because FedEx is in the business of printing documents for its customers.  See, e.g., Jerome Grp., 257 F. Supp. 2d at 1225 (finding a printing company's billing practices not to be a professional service).

1   The specific definition of **Professional Services** here does not warrant a

2   different result.  Texas law requires the Court to consider the Policy as a whole and

3   give meaning to all of its terms.  <u>Forbau</u>, 876 S.W.2d at 133 (Tex. 1994).

4   California law follows the same principle of interpretation.  <u>MacKinnon</u>, 31 Cal.

5   4th at 648, 73 P.3d at 1213.  The specific services enumerated in the definition of

6   **Professional Services** are the services that FedEx provides to its customers—

7   printing, scanning, copying, etc.  A receipt, by contrast, is a record of payment for

8   services already rendered.  Customers come to FedEx for the enumerated services

9   in the definition.  As to a printing job, for example, the customer asks FedEx to

10   print out certain documents for the customer.  Printing the documents as requested

11   is the service performed.  The self-service kiosk merely automates this process.

12   The customer pays FedEx for the printing job, and FedEx issues a receipt at its

13   kiosk to confirm that payment was received.  Printing a receipt for a printing job

14   performed on a kiosk at FedEx is no different than a doctor printing a receipt for

15   medical services performed for a patient; printing the receipt shows that the

16   customer paid for the medical services and is not itself part of the medical services

17   provided.  Reading the definition of **Professional Services** to include printing

18   receipts would take "printing" out of context and yield an unreasonable result.

19   Moreover, interpreting "services related thereto" in the definition of

20   **Professional Services** to include printing receipts would effectively read the

21   specific enumerated services out of the contract by effectively including virtually

22   all of FedEx's operations.  There would be no reason to enumerate certain

23   activities that constitute **Professional Services** if the Policy was intended to cover

24   all aspects of FedEx's business, including ministerial acts like printing receipts for

25   services performed.

26

27

28

15

Printing receipts therefore does not constitute **Professional Services**, and the Professional Services Liability Insuring Agreement is not triggered.

**V.     The Media Liability Insuring Agreement is not triggered.**

The FACTA Actions do not trigger the Media Liability Insuring Agreement because they do not qualify as a **Media Claim**.  A **Media Claim** is defined as "a **Claim** arising out of **Media Activity** and alleging:

> A. any form of defamation or other tort related to disparagement or harm to the character, reputation or feelings of any person or organization, including libel, slander, product disparagement, trade libel;
> B. any form of invasion, infringement or interference with rights of privacy or publicity, including false light, public disclosure of private facts, intrusion and commercial appropriation of name or likeness;
> C. false arrest, detention or imprisonment or malicious prosecution;
> D. wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy;
> E. infringement of copyright, title, slogan, logo, trademark, trade name, trade dress, service mark or service name;
> F. plagiarism, piracy, misappropriation of ideas under implied contract or other misappropriation of property rights, ideas or information;
> G. unfair competition or unfair trade practices alleged in conjunction with A. through F. above, including but not limited to dilution, confusion, deceptive trade practices or unfair trade practices, civil actions for consumer fraud, false, disruptive or misleading advertising or misrepresentation in advertising;
> H. negligent supervision of an employee alleged in conjunction with A. through F. above; or
> I. negligent or intentional infliction of emotional distress, outrage or outrageous conduct."

Policy § II.  The Policy expressly provides, however, that a **Media Claim** does not include any **Claim** alleging **Privacy Injury**.  Id.

As a threshold matter, the FACTA Actions do not qualify as a **Media Claim** because they do not arise out of **Media Activity**.  **Media Activity** is defined in

16

relevant part as "any actual or alleged act, error or omission occurring in the course of... the dissemination or utterance of **Material**, by any means, including… printing … through any medium, including but not limited to wireless or electronic medium."  Policy § II.  Printing a receipt does not constitute the "dissemination" of **Material**.  "Dissemination" is not defined in the Policy so it should be given its "plain, ordinary and generally accepted meaning."  Western Reserve Life Ins. Co. v. Meadows, 152 Tex. at 564, 261 S.W.2d at 557.   The dictionary defines "dissemination" as "the act of disseminating, or spreading *widely*." Dictonary.com,  https://www.dictionary.com/browse/dissemination?s=t  (emphasis added).   Publication and dissemination are synonyms.   See Thesaurus.com, https://www.thesaurus.com/browse/dissemination.

Courts have considered coverage for FACTA lawsuits under similar policy provisions providing coverage for "publication."    In Ticknor v. Rouse's Enterprises, LLC, 2 F. Supp. 3d 882, 895 (E.D. La. 2014), for example, the court held that a FACTA violation did not constitute "publication" because the receipts were not disseminated to the public.  The court noted, "[t]he transactions at issue were initiated by the plaintiffs, the receipts were provided only to the customer, and the receipts contained information the plaintiffs already possessed."   Id. Similarly, in Creative Hospitality Ventures, Inc. v. U.S. Liability Insurance Co., 444 F. App'x 370, 376 (11th Cir. 2011), the court held that a FACTA suit did not allege a publication so as to trigger insurance coverage because "[the insured] neither broadcasted nor disseminated the receipt or the credit card information to the general public."  Rather, the insured, "provided the receipt only to the customer (who already knows the credit card number and its expiration date)."   Id. Likewise, in Whole Enchilada, Inc. v. Travelers Property Casualty Co. of America,

581 F. Supp. 2d 677, 697 (W.D. Pa. 2008), the court held that a FACTA suit did not allege "publication" within the meaning of an insurance policy because "the printed receipts are not made generally known, publicly announced, nor disseminated to the public."

In the FACTA Actions, there is no allegation that FedEx ever provided the offending receipts to anybody other than the customers themselves. Accordingly, the receipts do not constitute **Media Activity** because there is no "dissemination" of **Material**.

Moreover, although there is no need to reach the issue, the FACTA Actions do not fall within any of the nine enumerated categories of **Media Claims** stated in subsections A-I of the definition of that term, and, even if they did, they fall within an express exclusion from the definition. First, the only category of **Media Claim** that could plausibly be implicated by the FACTA Actions is that stated in subsection B, for claims alleging "any form of invasion, infringement or interference with rights of privacy or publicity, including false light, public disclosure of private facts, intrusion and commercial appropriation of name or likeness." Policy § II. None of the specific examples listed in subsection B are relevant here, as the FACTA Actions do not allege anything akin to these specific torts. So, the FACTA Actions could only fall within subsection B if they allege "any form of invasion, infringement or interference with rights of privacy." On the facts here, any contention by FedEx that the FACTA Actions fall within subsection B would be an unreasonable stretch.

In any event, even if the FACTA Actions fell within subsection B, they would be expressly excluded from the definition of **Media Claim** because they allege **Privacy Injury**. As noted above, **Privacy Injury**, is defined as "any

unauthorized disclosure of … **Nonpublic Personal Information** … in violation of: …any federal, state, foreign or other law (including common law), statute or regulation governing the confidentiality, integrity or accessibility of information…" **Nonpublic Personal Information**, in turn, is defined to mean "two or more elements of information not available to the general public from which an individual may be identified, including without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, and account histories." Id.

Disclosure of non-public information in violation of a federal law regarding confidentiality of information (here, FACTA) is at the heart of the FACTA Actions. For example, the Duncan Lawsuit alleged precisely how the information on the receipts could lead to identity theft:

> 32. Here, in addition to revealing the last four digits of each payment card number on FedEx receipts, FedEx also reveals the first two. These digits constitute the "Issuer Identification Number" ("TIN"), which can uniquely identify both the card brand and the bank or institution that issued the card. Databases associating IINs with card brands and banks are widely and freely available online.
>
> 33. Accordingly, a criminal in possession of a FedEx receipt is not only aware that the receipt is associated with a customer of Defendant's printing or business services, but also exactly which bank and card brand that customer uses, as well as the date and amount of that customer's purchases.
>
> 34. This information, coupled with the six digits of that customer's payment account number can easily be used to impersonate that customer's bank and potentially to trick that customer out of other sensitive information, including the remaining ten digits.

Duncan Lawsuit ¶¶ 32-34. The Duncan Lawsuit alleged the receipts effectively disclosed at least four types of **Non-Public Information.** The Cohen Lawsuit and the Beltran Draft Complaint likewise reflect privacy concerns. Cohen Lawsuit ¶¶

19

13, 70; Beltran Draft Compl. ¶ 17.  The FACTA Actions therefore allege **Privacy Injury** which cannot be a **Media Claim** as required to trigger the Media Lability Insuring Agreement.

In short, the FACTA Actions do not allege **Media Activity** and therefore cannot qualify as a **Media Claim**.  Moreover, even if **Media Activity** were alleged, the FACTA Actions do not qualify as a **Media Claim**.  In particular, either the FACTA Actions fail to make the required predicate allegations for a **Media Claim** or they are expressly carved out of the definition of **Media Claim** because they allege **Privacy Injury**.[6]  Either way, the FACTA Actions do not constitute a **Media Claim**.

## VI.   Since no coverage is available under the Policy, FedEx's extra-contractual claim also fails.

Under Texas law, "[t]he general rule is that an insured cannot recover policy benefits for an insurer's [bad faith[7]] if the insured does not have a right to those benefits under the policy."  USAA Texas Lloyds Co. v. Menchaca, 545 S.W.3d 479, 490 (Tex. 2018).  However, Texas courts allow standalone bad-faith claims to proceed in the "rare"[8] instances where the insured's purported "damages are truly

---

[6] Although it happens to be true here, claims alleging "any form of invasion, infringement or interference with rights of privacy or publicity" and those alleging **Privacy Injury** are not always co-extensive.  For example, claims alleging commercial appropriation of name or likeness would not allege a **Privacy Injury** because such claims do not involve the disclosure of any **Nonpublic Information**.

[7] FedEx purports to bring this case under California law and styles its claim as a breach of the covenant of good faith and fair dealing.  Under Texas law this type of claim would be referred to as a bad-faith claim.  Despite the differences in terminology, these extra-contractual claims are functionally the same for the purposes of this motion.

[8] Independent bad-faith claims are so rare that the Texas Supreme Court has stated that it had "yet to encounter one." Id. at 500.

Case No. 2:20-CV-4799-MWF-AGR
Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings

independent of the insured's right to receive policy benefits." Id. at 499-500. "When an insured seeks to recover damages that "are predicated on," "flow from," or "stem from" policy benefits, the general rule applies and precludes recovery unless the policy entitles the insured to those benefits." Id. at 500.  Once courts find that a breach-of-the-policy claim warrants dismissal, they will dismiss extra-contractual claims that that are not independent of the contractual claim.  See, e.g., Moore v. Allstate Tex. Lloyd's, 742 F. App'x 815, 819 (5th Cir. 2018) (applying Texas law; affirming dismissal of bad-faith claim where complaint failed to allege an injury independent of the denial of claim under the policy); Garza v. Allstate Fire & Cas. Ins. Co., No. 7:19-CV-129, 2020 WL 3077596, at *11 (S.D. Tex. June 10, 2020) (granting motion to dismiss for similar reasons).

California law is even less favorable to FedEx on this issue.  It is not clear that California allows a claim for breach of the covenant of good faith and fair dealing at all where there is no breach of the policy.  See Marentes v. State Farm Mut. Auto. Ins. Co., 224 F. Supp. 3d 891, 915 (N.D. Cal. 2016) (analyzing California cases).  The California Supreme Court has held that, "[i]t is clear that if there is no potential for coverage … there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 36, 900 P.2d 619, 639 (1995).  A few California courts have suggested in dicta that there is a *potential* for a standalone extra-contractual claim in the absence of contractual liability in "unusual circumstances" involving "extreme conduct" although those courts did not find the facts before them to qualify.  Marentes, 224 F. Supp. 3d at 917-18; see also Williams v. Chubb Grp. of Ins. Cos., 77 F.3d 491 (9th Cir. 1996) (referring to a standalone covenant

claim as a "novel theory" and noting that none of the cases suggesting such a claim was possible actually allowed it on the facts).

Because none of the Policy's insuring clauses are triggered, FedEx's breach-of-contract claim fails.  FedEx's extra-contractual claim must also fail under either Texas or California law because FedEx has not alleged any injury that is independent of the allegedly improper denial of benefits under the Policy.  FedEx raises a litany of potential extra-contractual theories but does not identify any way in which it was damaged other than the loss of benefits under the Policy.  Compl. ¶ 35.  Accordingly, the "general rule" should apply to bar FedEx's covenant claim. Menchaca, 545 S.W.3d at 500; see, e.g., Moore, 742 F. App'x at 819 (5th Cir. 2018); Garza, 2020 WL 3077596, at *11.

## VII.   Even if coverage is available, FedEx's extra-contractual claim should be dismissed.

Even if the Court were ultimately to determine that Continental's coverage position is erroneous, there cannot be extra-contractual liability here.  Texas follows the bona fide dispute rule whereby "[e]vidence that only shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith." U.S. Fire Ins. Co. v. Williams, 955 S.W.2d 267, 268 (Tex. 1997) (citing Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Dominguez, 873 S.W.2d 373, 376 (Tex. 1994)).  "Simply because the parties go to court does not raise an issue of the insurer's bad faith." Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 18, n.8 (Tex. 1994).  California likewise does not impose extra-contractual liability where the parties have a legitimate dispute over the interpretation of the policy.  See Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1280–81, 31 Cal. Rptr. 2d 433, 440 (1994) ("The mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law,

does not expose the insurer to bad faith liability"). Where, as here, the insurer takes a reasonable coverage position, and the Complaint does not contain allegations of anything beyond a bona fide dispute over insurance coverage, dismissal of extra-contractual claims is warranted. See, e.g., Guey Ming Yeh v. Safeco Ins. Co. of Ind., No. 4:18-CV-00026, 2018 WL 1858151, at *4 (E.D. Tex. Apr. 18, 2018); CAMCO Pac. Constr. Co., Inc. v. Lexington Ins. Co., No. SACV131807DOCJPRX, 2014 WL 12584440, at *6 (C.D. Cal. May 21, 2014); Weidner v. Nationwide Prop. & Cas. Ins. Co., No. 4:13-CV-263, 2014 WL 8397281, at *8 (E.D. Tex. June 6, 2014), R. & R. adopted, No. 4:13-CV-263, 2014 WL 8494527 (E.D. Tex. Aug. 19, 2014); Walsh v. Provident Mut. Life Ins. Co. of Phila., No. CV98-10602 NM(RCX), 1999 WL 511928, at *7 (C.D. Cal. Apr. 22, 1999).

## CONCLUSION

This case presents a straightforward issue of insurance contract interpretation. Based on the facts as alleged by FedEx, the insuring agreements of the Policy are not triggered. Consequently, Continental's motion for judgment on the pleadings should be granted and FedEx's Complaint should be dismissed.

1   Dated:  September 11, 2020              Respectfully Submitted,

2

3                                          CNA COVERAGE LITIGATION
                                           GROUP
4

5                                          /s/ Robert Christensen
                                           Robert Christensen
6                                          Julie Humphreys

7                                          WILEY REIN LLP
8                                          Richard A. Simpson (admitted *pro hac
                                           vice*)
9                                          Joseph W. Gross (admitted *pro hac
                                           vice*)
10

11
                                           *Attorneys for Defendant Continental
12                                         Casualty Company*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:20-CV-4799-MWF-AGR
Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 11, 2020, I caused a true and correct copy of the foregoing to be served via CM/ECF on all counsel of record.

/s/ Robert Christensen

Robert Christensen

Case No. 2:20-CV-4799-MWF-AGR

Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings